604 So.2d 794 (1992)
Henry Alexander DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 75467.
Supreme Court of Florida.
July 16, 1992.
*795 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Ralph Barreira, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Henry Alexander Davis was convicted of first-degree murder, armed robbery, and burglary and sentenced to death for the murder. He appeals his conviction and death sentence. Our jurisdiction is mandatory. Art. V, § 3(b)(1), Fla. Const.
On the evening of March 18, 1987, the body of seventy-three year old Joyce Ezell was discovered in the foyer of her house just inside the front door. She had suffered twenty-one stab wounds. There were no signs of forced entry. Several items were missing from Ezell's home, including silver serving pieces, her purse and wallet, a pearl-handled pistol, some rare coins, jewelry, a ring belonging to her late husband, and her car. Davis was acquainted with Ezell because he had done yard work at her house with his stepfather.
Ezell's neighbor, Harold Brown, told police officers that he saw a black man walk up to Ezell's door at approximately 7:15 a.m. March 18. Several days later, Brown *796 identified Davis from a photographic lineup as the man he had seen.
Ezell's car was discovered the day after the murder in a sink hole approximately five miles from her residence. Evidence indicated that at least three people had occupied the car recently. Silver serving pieces belonging to the victim were in the trunk. Davis's fingerprints were found on the power window control on the driver's side of the car and on several items recovered from the trunk of the vehicle. Fingerprints taken from inside the victim's house also matched Davis's fingerprints.
John Johnson, an acquaintance of Davis's, testified that he took Davis to a pawn shop the morning after the murder so that Davis could pawn a ring and an old pistol. The description Johnson gave of the pistol matched the pistol missing from Ezell's house. The ring, which had belonged to Ezell's late husband, was recovered from the pawn shop.
Davis was arrested on March 20, 1987. He denied committing the murder and said that he had not been in the victim's house or car. He initially said that he had been picking watermelons on the day of the murder but later said that he had been babysitting. A few days after his arrest, Davis told officers that the day before the murder, a black man who looked exactly like him showed him a weapon similar to an ice pick and said that he was going to rob Ezell. Davis said that he saw the man the day after the murder and the man asked him if he heard what happened. Davis also told the officers that he had seen Ezell at the post office on the day before the murder and he offered to go to her house to put up groceries. He said that he went to her house, put up groceries, then locked her car and left.
Davis was initially found incompetent to stand trial after he performed poorly on certain tests and indicated that he had no recall of events on the day of the murder. He was sent to Florida State Hospital where he was treated and evaluated for approximately nine months. Upon his release from the hospital, Davis was evaluated again, was found to be competent, and went to trial. After the conviction, the trial judge followed the jury's unanimous recommendation and imposed the death penalty for the murder.
In his first claim on appeal, Davis asserts that he was denied a fair trial by the State's suggestion to the jury on two occasions that he had been involved in other criminal activity. During the guilt phase of trial, State witness Harold Brown testified that after the murder he went through several books at the police station and selected pictures that looked similar to the man he had seen at Ezell's door on the morning of the murder. The prosecutor then showed Brown a folder containing a photographic lineup from which Brown had identified Davis shortly after the murder. Defense counsel objected and moved for a mistrial, claiming that the pictures were "mug shots" and implied to the jury that Davis had a record. The court denied the motion.
We find nothing in the photographs, the testimony, or the circumstances that would have suggested to the jury that Davis had a prior criminal record. Neither the witness nor the prosecutor referred to the photographs as mug shots. The pictures were closely cropped, showing only the neck and face and leaving no marks that would identify their origin. See D'Anna v. State, 453 So.2d 151 (Fla. 1st DCA 1984). Davis argues that because Brown identified him in court, there was no need for testimony or evidence relating to the picture identification. Under the facts of this case, Brown's identification of Davis from the photographic lineup was relevant and probative. Brown identified Davis from the six photographs shortly after the murder. That identification carried more weight and credibility than Brown's in-court identification of Davis more than three years later.
The second incident about which Davis complains occurred during the penalty phase. Davis's mother testified that Davis fell from a tree approximately four months before the murder. She claimed that the fall caused pronounced behavioral changes in Davis. Davis's sister, Alma *797 Sheppard, testified that Davis acted abnormally and behaved quite differently after the fall. The following interchange occurred during the State's cross-examination of Sheppard:
[Prosecutor]: Was there anything else Henry had become involved in that you thought might have added to his change in behavior?
[Sheppard]: I don't know. When you say involved in?
[Prosecutor]: Well, isn't it true, Alma, that Henry became involved in cocaine back about the same time?
[Sheppard]: I cannot answer that because I do not know.
Defense counsel objected and moved for a mistrial. The trial court denied the motion, finding that the prosecutor had a good faith basis for the question.
We do not reach the issue of whether the prosecutor's question was proper because we find that any error was harmless beyond a reasonable doubt. Sheppard denied any knowledge that Davis used cocaine. There was no further reference to the matter before the jury. Further, there was evidence presented during the guilt phase from which the jury could have concluded that Davis used drugs. A witness testified that he saw Davis the day after the murder and that he "seemed like he was high or something." In addition, a bent soft drink can was found in the victim's car which suggests that a person or persons in the car had used crack cocaine.
Next, Davis argues that the trial court erred in denying his motion for a mistrial and failing to give a curative instruction after the prosecutor made an improper "Golden Rule" argument. Near the end of his penalty phase closing argument, the prosecutor told the jury "it might not be a bad idea to look at [the knife] and think about what it would feel like if it went two inches into your neck." The court sustained defense counsel's objection to this argument. At the end of the prosecutor's argument, defense counsel moved for a mistrial. The court concluded that the bulk of the State's argument was technical and unemotional and appealed to the jury to follow the rules. The judge denied the motion for mistrial and determined not to give a curative instruction because it would only emphasize the comment.
Although the comment was improper, we find that under these circumstances a mistrial is not warranted. The remark occurred at the end of a lengthy and otherwise unemotional closing argument. The comment was not so egregious as to fundamentally undermine the reliability of the jury's recommendation. See Pope v. Wainwright, 496 So.2d 798, 803 (Fla. 1986), cert. denied, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987); Bertolotti v. State, 476 So.2d 130 (Fla. 1985). Any error resulting from this single, isolated comment was harmless beyond a reasonable doubt.
Next, Davis challenges two of the aggravating circumstances found by the trial court.[1] Davis argues that the evidence does not support the finding that the murder was especially heinous, atrocious, or cruel. We disagree. The medical expert testified that no single wound was sufficient to cause the victim's death. She bled to death from the multiple stabs wounds. According to the medical examiner's testimony, it was unlikely that the victim was rendered unconscious by the blow she sustained to her head. The victim could have been conscious for thirty to sixty minutes before her death. Other evidence leads to the inference that the victim struggled with her assailant. A witness testified that Davis had scratches on his face the day after the murder and that Davis said that an old lady scratched him. Further, the victim suffered stab wounds to her adam's apple and upper chest, suggesting that she was stabbed while she was standing up or struggling. We find that the evidence establishes this factor beyond a reasonable doubt.
*798 We agree with Davis that the trial court erred in finding that the murder was committed for the purpose of avoiding arrest. In the sentencing order, the court stated:
It was shown the victim and the Defendant were acquainted with each other, and that she therefore, unless prevented from doing so, could specifically identify the Defendant as the person who burglarized her home and robbed her of her possessions. The Court therefore finds that one of the Defendant's motives for killing the victim was to prevent his identification.
We have long held that in order to find this aggravating factor when the victim is not a law enforcement officer, the State must show that the sole or dominant motive for the murder was the elimination of the witness. See Perry v. State, 522 So.2d 817, 820 (Fla. 1988); Bates v. State, 465 So.2d 490, 492 (Fla. 1985). The fact that witness elimination may have been one of the defendant's motives is not sufficient to find this aggravating circumstance. Further, the mere fact that the victim knew the assailant and could have identified him is insufficient to prove the existence of this factor. Perry, 522 So.2d at 820. The only evidence argued to the jury in support of this factor was that the victim knew Davis and could have identified him to the police. We find no other facts in the record to support the finding of this aggravating circumstance.
In addition, the trial court erred in considering commission of the murder during the course of a burglary and for pecuniary gain as two aggravating factors. Doubling of aggravating factors is improper where the factors are based on the same aspect of the criminal episode. Under the facts of this case, it is apparent that the sole purpose of the burglary was pecuniary gain. Thus, these should have been considered as a single aggravating circumstance. See Campbell v. State, 571 So.2d 415, 418 (Fla. 1990); Cherry v. State, 544 So.2d 184, 187 (Fla. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 963 (1990); Blanco v. State, 452 So.2d 520, 525 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985).
With respect to mitigation, Davis presented evidence that he suffered from brain damage, perhaps as a result of a fall suffered four months before the murder. Two mental health experts testified that he was under the influence of an extreme mental or emotional disturbance at the time of the murder. The court found insufficient evidence in the record upon which the experts could base such an opinion. In addition, the defense experts opined that Davis's capacity to conform his conduct to the requirements of law was substantially impaired. With respect to this testimony, the trial judge found the following:
[This] proposition is unsupported by any other evidence in the record. The facts reveal that after killing the victim, the Defendant methodically burglarized the home, wiped clean the murder weapon, loaded the car with stolen items, and took steps to hide the car. All of this indicates the Defendant clearly understood what he was doing, why he was doing it, and that it was unlawful. Thus recognizing the nature of his activities there is nothing to demonstrate that he could not conform his conduct to the requirements of the law.
We note that the State presented substantial expert testimony to refute the mental health testimony presented by Davis. Two mental health experts testified that Davis's poor performance on neurological tests and his lack of recall were attributable to malingering. In particular, the psychologist who evaluated Davis during his stay at Florida State Hospital testified that there was no evidence that Davis had organic brain damage, that Davis had suffered no significant head injuries, and that he showed no signs of psychosis. According to her testimony, when Davis felt that he was being evaluated, he would start to exhibit memory problems. He showed no problems when he did not suspect that he was being evaluated.[2] Even the defense *799 experts acknowledged the possibility that Davis was malingering. Thus, there was competent and substantial evidence which supports the trial judge's findings on Davis' mental status.
Because we have eliminated two aggravating circumstances, we cannot say beyond a reasonable doubt that the judge would have imposed the death sentence without consideration of those aggravating factors. Therefore, we affirm Davis' conviction, but we vacate his death sentence. We remand the case to the trial judge to reweigh the evidence in light of our opinion and to impose the appropriate sentence.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in result only.
NOTES
[1] The trial judge found four aggravating circumstances: (1) the murder was committed during a burglary; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed for financial gain; and (4) the murder was especially heinous, atrocious, or cruel.
[2] The trial judge also refused to find that Davis was under the substantial domination of another person and his participation in the murder was relatively minor, and that he acted under extreme duress or the substantial domination of another person. The trial judge found that the only basis for these statutory mitigating factors was Davis's unsworn statements to his examining psychologists made years after the murder and after he denied any memory of what took place. Davis told defense psychologists that on the morning of the murder, two men drove him to Ezell's house to do yard work. While he was working in the yard, the two men murdered Ezell. After Davis discovered the murder, he panicked and the three men plundered the house. He said that the men told him that they would harm him or his family if he told anyone. The court noted that there was no physical evidence to establish that anyone other than Davis and the victim were in her house.